IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VICTOR D. PENDLETON, ) | |
| ) | |
| Plaintiff, ) | No. 10 C 4587 |
| ) | |
| v. ) | Magistrate Judge Schenkier |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of ) | |
| the Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER[1]

The plaintiff, Victor Pendleton, moves for summary reversal and/or remand of a final decision by the Commissioner of the Social Security Administration ("SSA") denying him Supplemental Security Income ("SSI") pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g) (doc. # 18). The Commissioner has filed a cross-motion for summary judgment to affirm the decision (doc. # 20). For the reasons set forth below, we deny the plaintiff's motion, we grant the commissioner's motion, and we affirm the final decision of the Commissioner.

I.

We begin with the procedural history of this case. Mr. Pendleton applied for SSI on January 17, 2006, alleging a disability onset date of December 30, 2005. His application was denied initially on March 6, 2006, and again upon reconsideration on May 9, 2006 (R. 63-77). Thereafter, Mr. Pendleton filed a timely request for a hearing, which was granted. The hearing took place before Administrative Law Judge ("ALJ") Joseph P. Donovan on March 4, 2008, in Orland Park, Illinois.

---

[1] On September 16, 2010, by the consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. ## 11, 12).

At the hearing, the ALJ heard from Mr. Pendleton, as well as medical expert ("ME"), Dr. William Newman, and vocational expert ("VE"), Lee O. Knutson.

On September 26, 2008, the ALJ issued a written decision (R.17-23), finding that Mr. Pendleton was not disabled as of the January 17, 2006 date of his application because he could perform work that exists in substantial numbers in the national economy. In that decision, the ALJ held that Mr. Pendleton had the residual functional capacity ("RFC") to perform medium work as defined by 20 C.F.R. 416.967(c), except that he would only be able to stand for up to two hours and walk for up to six hours (R. 20). The ALJ also noted that Mr. Pendleton "should never climb ladders, ropes or scaffolds and only occasionally balance, crouch, or crawl and should avoid concentrated exposure to machinery and heights" (*Id.*).

On November 7, 2008, Mr. Pendleton appealed the ALJ's decision to the Appeals Council of the SSA (R. 6). On May 25, 2010, the Appeals Council denied his request for review (R. 1-3), making the ALJ's decision the final decision of the Commissioner under 42 U.S.C. § 405(g). *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## II.

We now summarize the administrative record. We set forth the evidence from Mr. Pendleton's hearing testimony concerning his history and medical complaints in Part A, followed by the medical record evidence in Part B. In Part C, we discuss the hearing testimony provided by the medical and vocational experts, and in Part D, we address the ALJ's written opinion.

### A.

Mr. Pendleton was born on April 23, 1966 (R. 27). He is six feet, four inches tall and weighs 280 pounds (R. 31). Mr. Pendleton attended high school until the twelfth grade, and later received

his graduate equivalency degree in 1986 (R. 27). He lives with his sister in Matteson, Illinois, and receives public aid (R. 30). Mr. Pendleton cares for himself at home, except that his sister usually cooks his meals (R. 31). He has never used alcohol or drugs (R. 32).

Mr. Pendleton has worked in shipping and receiving, material handing, and truck unloading, and as an assembly line worker, laborer, and crane operator (R. 55). His last paying job was in 2002, when he worked as a manual laborer in a steel mill (R. 29). Mr. Pendleton testified that, during his job in the steel mill, heavy pieces of metal used to fall on his left foot (R. 42-43). Mr. Pendleton claims that he can no longer perform his past heavy lifting jobs in steel mills, because his foot pain has markedly limited his ability to walk or stand (R. 40).

According to Mr. Pendleton, his left foot constantly causes him pain (R. 30), which interferes with his concentration (R. 35) and disturbs his sleep (R. 37). He stated that he can only sit or stand for two to three minutes before experiencing discomfort (*Id.*). Mr. Pendleton further stated that he can walk "maybe 30 to 40 feet" unassisted, and cannot crouch down or move about on his hands and knees (R. 32, 39). He also stated that he can lift "maybe 50 pounds" and carry "maybe 20" (R. 33), but he would have difficulty pushing or pulling a cart carrying 50 pounds because of the pressure it would exert on his left foot (R. 33). Mr. Pendleton testified that he experiences pain in his right foot as well, which he attributes to the use of his right foot to compensate for the left foot (R. 34).

Mr. Pendleton has taken various pain relievers for his foot pain, including Ibuprofen, Tylenol, Naproxen, and Sulindac (R. 36). He has also taken the non-steroidal, anti-inflammatory medication, Diclofenac (*Id.*). Mr. Pendleton explained that these medications have offered him little relief (*Id.*).

Mr. Pendleton retains the ability to reach overhead with both arms and extend both arms in front of himself (R. 32). He can also pick up and manipulate small objects from a table (R. 34), and

3

lift objects weighing upwards of 20 to 50 pounds from the tabletop level (*Id.*). Mr. Pendleton stated that he requires prescription eyeglasses and has some sensitivity to light (R. 35, 38). He also suffers from chronic ear infections (R. 35, 53). However, his senses are otherwise normal (*Id.*).[2]

**B.**

The medical evidence of record documents Mr. Pendleton's foot problems and chronic ear infections. On December 30, 2005, Mr. Pendleton was examined at the emergency room of Oak Forest Hospital after he complained of ear pain and hearing loss for approximately two weeks (R. 189-207). He was diagnosed with a middle ear infection and treated with the medication, Naprosyn (R. 203-207). During his visit, Mr. Pendleton reported painful swelling in his left foot and blisters (R. 189-206). He was diagnosed with chronic foot pain and referred to a foot clinic (*Id.*).

The medical evidence shows that Mr. Pendleton suffered a fracture in his left foot in 2003, which went untreated (R. 183-184). On January 3, 2005, Mr. Pendleton visited the emergency room of Oak Forest Hospital with complaints of pain in his left foot after prolonged walking (R. 170-171). He was diagnosed with calluses and a plantar of the left foot, and prescribed Ibuprofen (R. 172-174, 332-345). Progress notes from Mr. Pendleton's February 2006 visit to Fantus Health Center ("FHC") show that he was diagnosed with post traumatic pain in the left foot secondary to previous fractures (R. 210), post traumatic degenerative joint disease (R. 211, 215), bilateral ankle arthritis (R. 213), and arthritis secondary to a fracture of the left foot (R. 218). At FHC, Mr. Pendleton was dispensed a cam walker for his left foot, which he was advised to wear daily (R. 210). Mr. Pendleton

---

[2] Mr. Pendleton also mentioned at the hearing that he had recently been admitted to the hospital for chest pains, where he was kept overnight for observation (R. 54). After counsel for Mr. Pendleton stated that there might not be information about this incident in the record, the ALJ stated that he would keep the record open for two weeks so that counsel for Mr. Pendleton could submit any records relating to that incident if he wished (*Id.*).

later reported to FHC that he had discontinued use of the cam walker after his right foot began to hurt as a consequence of using the cam walker on his left foot (R. 218).

On March 8, 2006, Mr. Pendleton was examined at the emergency room of Stroger Hospital following additional complaints of foot pain (R. 224-226). After Mr. Pendleton's left foot was examined, it was noted that he may have re-fractured his foot by increased ambulation (R. 226). A March 29, 2006 x-ray of Mr. Pendleton's left foot revealed findings of an old fracture, as well as soft tissue swelling at the PIP joint of the great toe and mild flat foot (R. 303, 305). An x-ray of Mr. Pendleton's right foot revealed mild hallux valgus with minimal deformity (R. 304, 306). An October 2006 medical report shows that Mr. Pendleton was examined again, after continuing to complain of foot pain (R. 350-352). He was diagnosed with plantar fasciitis (mild) (R. 274, 352), and it was recommended that Mr. Pendleton receive steroid injections (R. 275, 353).

In a physical therapy report dated January 31, 2007, Mr. Pendleton was diagnosed with traumatic arthritis of the third metatarsal with symptoms of foot pain that impacted his ability to perform work duties (R. 368). Mr. Pendleton was prescribed three weeks of physical therapy, which he completed (R. 369-370). Mr. Pendleton received injections on February 6, 2008 (R. 359, 361).

## C.

In addition to Mr. Pendleton's testimony, the ALJ heard testimony from the ME and the VE at the March 4, 2008 hearing. We begin with a summary of the ME's testimony, before summarizing the VE's testimony.

## 1.

The ME testified on the condition of Mr. Pendleton's feet. He testified that Mr. Pendleton's March 29, 2006 x-ray suggested that there had been healed fractures at the shaft of the second

through fourth metatarsals of his left foot (R. 41, 43). Further, the ME stated that he observed a slight bony angulation at the fourth metatarsal and a radiolucent line of new bone surrounding Mr. Pendleton's toe, suggesting a healed fracture (R. 42, 43). The ME also observed soft tissue swelling at the great toe at the PIP joint (*Id.*), which supported the ME's conclusion that Mr. Pendleton has some old healed fractures in his left foot (*Id.*). The ME opined that pain in the left forefoot might affect the ability to crouch of a person Mr. Pendleton's size (R. 53).

With respect to Mr. Pendleton's right foot, the ME testified that an April 10, 2006 x-ray showed a mild hallux valgus, and noted that "[m]etatarsal shafts are relatively benign without any evidence of cortical bone or fractures" (R. 42). The ME observed a mild flat foot and very minimal deformity in the mid shaft of the right fourth proximal phalanx, suggesting that the fourth toe of Mr. Pendleton's right foot had previously been broken (R. 42-43). The ME also noted that a podiatrist in the record had diagnosed Mr. Pendleton with plantar fasciitis (R. 42).

The ME and the ALJ then questioned Mr. Pendleton. First, the ME asked Mr. Pendleton if he had ever worn special shoes for his plantar fasciitis (R. 42). Mr. Pendleton answered that he had not (*Id.*). Next, the ME asked if Mr. Pendleton had broken his foot in 2003 (*Id.*). Mr. Pendleton responded that he had seen a doctor in 2003 due to foot pain, but he couldn't ascertain when the fractures in his foot occurred because "steel weighing many, many pounds" used to fall on his foot and he would "just go back to work" (R. 42-43). The ALJ then asked Mr. Pendleton if he wore steel-toed boots at work, to which Mr. Pendleton responded in the affirmative (R. 43). Finally, the ME asked if Mr. Pendleton had ever been tested for gout, which he had not (*Id.*).

The ME concluded that none of Mr. Pendleton's impairments meet or equal a listing level impairment (R. 43). The ME opined that, based on the record, Mr. Pendleton's RFC would allow

him to perform medium work, which included occasionally lifting 50 pounds and frequently lifting 25 pounds, sitting, standing, and walking six hours per day, and "push[ing] and pull[ing] unlimited except to lift and carry" (R. 44).

Counsel for Mr. Pendleton then questioned the ME about plantar fasciitis (R. 44). The ME explained that plantar fasciitis results from the tearing of the attachment of the plantar fascia to the heel bone (*Id.*). The ME stated that plantar fasciitis can be accompanied by a painful feeling similar to stepping on a stone (*Id.*). Counsel asked the ME if it would be appropriate for someone with this injury to stand for six hours out of an eight-hour day (*Id.*). The ME stated that plantar fasciitis is an injury that heals, the natural history of which "shouldn't last six months" (R. 44-45). The ME stated that the healing process would only be delayed if "somebody's put cortisone in there, or done some operation such as taking off that little spur that's on the bottom of the heal" (R. 45).

Counsel then inquired into the ME's treatment of plantar fasciitis (R. 48). The ME stated that he treats plantar fasciitis by making pads for patients to be used as arch supports in rippled soled, sponge rubber shoes (*Id.*). The ME explained that these pads are intended to take pressure off of the sore spot when the feet bear weight, and that plantar fasciitis will get better with time (*Id.*). The ME stated that he did not know if Mr. Pendleton actually had plantar fasciitis, based on the single diagnosis of a podiatrist in the record (R. 49). Specifically, the ME stated, "[w]e don't have adequate physical examinations . . . blood tests . . [or] know about his circulation" (*Id.*). The ME further stated that he'd like to have the results of a Doppler test, as "[t]here's all kinds of things that could be investigated as far as [Mr. Pendleton's] foot pain is concerned" (R. 49). The ME also stated that, when he sees plantar fascitis, he always tests for gout (R. 48).

Counsel directed the ME to Mr. Pendleton's outpatient notes on page two of Exhibit 6F, which stated that Mr. Pendleton had experienced "post traumatic pain left foot secondary to previous fractures" (R. 46). The ME stated that he did not understand why there would be such a diagnosis based on Mr. Pendleton's healed fractures (*Id.*). Counsel then pointed to notations of swelling in the left forefoot and "pain on palpation at the left foot which is increased at the level of MPT two to five," and asked the ME what condition these notations would indicate (*Id.*). The ME responded that, if Mr. Pendleton were his patient, he would test for gout, which is common in larger patients (*Id.*). The ME stated that, while Mr. Pendleton's symptoms were not typical for gout because "[gout] symptoms go in episodes and you have local swelling," he remarked that "it is true that gout has a tendency to become symptomatic in a part of the body around a joint that's been injured in the past" (R. 47). The ME stated that a connection between Mr. Pendleton's old injury and gout was possible, but the ME couldn't know if Mr. Pendleton had gout without a blood test (*Id.*). The ME then asked if Mr. Pendleton had seen an orthopedic doctor or other type of medical doctor (*Id.*). Counsel responded that Mr. Pendleton had not (*Id.*).

Counsel then directed the ME's attention to a notation in a March 8, 2006 report contained in Exhibit 6F that refers to post-traumatic degenerative joint disease (R. 51). The ME stated that Mr. Pendleton's x-ray does not show this condition (R. 52). The ALJ, however, noted that there were several references to post-traumatic degenerative joint disease in Mr. Pendleton's progress notes from Cook County hospital (R. 53).

Counsel also asked the ME about plano valga, which the ME defined as "flat feet" (R. 45). The ME explained that one of Mr. Pendleton's x-rays showed flat feet, which "can cause some foot

strain" (*Id.*). The ME noted, however, that the podiatrist seen by Mr. Pendleton did not recommend arch support or exercises for flat feet (R. 46).

**2.**

Next, the VE testified. The VE began by questioning Mr. Pendleton about some of his past jobs. Mr. Pendleton explained that in his job as a package sorter, he would stand and lift up to 70 pounds (R. 56). He stated that during his forklift and material handling work for another company, he would independently lift up to 50 pounds (*Id.*). Mr. Pendleton further stated that he also had worked operating a hand walking crane, which came down from overhead and would be operated by pushing buttons (R. 57)

The VE then classified Mr. Pendleton's past relevant work. First, the VE stated that Mr. Pendleton's work operating forklifts and cranes was that of a material handler, which is considered semiskilled and heavy, and would involve loading and unloading trucks as well as using a hand pallet, jack and other tools (R. 57). He explained that the material handler position has a specific vocational preparation time ("SVP")[3] of 3 (*Id.*). Second, the VE stated that Mr. Pendleton's job sorting packages was as a line worker, which is unskilled and heavy because he had to be able to lift packages up to 70 pounds (*Id.*). The VE explained that the line worker position holds an SVP of 2 (*Id.*).

The ALJ then sought the VE's opinion on a hypothetical individual. In the hypothetical, the ALJ described a person of Mr. Pendleton's background who has the RFC to do the following: lift

---

[3] SVP is defined as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." U.S. Department of Labor, Dictionary of Occupational Titles ("DOT"), Appendix C (II) (4th ed., rev. 1991). This training "may be acquired in a school, work, military, institutional, or vocational environment" (*Id.*).

and carry 50 pounds occasionally, 25 pounds frequently; stand and walk at least two hours in an eight hour day; sit with normal breaks for six hours in an eight hour day; push and pull unlimited "except as shown in lift and carry," where the physical non-exertional limitation is postural; frequently climb ramps and stairs, but never ladders, ropes or scaffolds; balance at heights, crouch, or crawl occasionally; stoop and kneel frequently; and manipulate objects and reach them unlimited; with no environmental limitations except avoiding concentrated exposure to unprotected heights (R. 58).

The VE opined that such a person could not perform any of Mr. Pendleton's past jobs (R. 58). The VE explained that, if the person were only able to stand for two hours, they would require a sedentary job (*Id.*). The VE stated that there were several sedentary and unskilled jobs that fit this profile, include 2,900 sedentary bench assembler jobs in the Chicago area, as well as 3,800 sedentary machine tender jobs, 3,500 sedentary hand packers, and 3,600 order clerk positions (R. 58-59). The VE listed the following citations for these jobs: 209.567-014 for order clerk, 920.687.030 for hand packer, 726.687-046 for machine operator, and 715.684-026 for bench hand assembler (R. 59).

Counsel for Mr. Pendleton asked the VE if those jobs would still be possible for a hypothetical claimant who could only stand ten minutes at any given time (of the two hours they were to stand per day), and could walk no more than 100 yards (R. 59). The VE responded that the hypothetical claimant could still perform these jobs because "[t]hey are basically seated jobs," except that the VE would reduce the 3,800 sedentary machine tender jobs by half – to 1,900 (R. 59-61). The VE stated that the same would be true for someone who was unable to crouch (R. 59).

### D.

In his September 26, 2008 written opinion, the ALJ applied the Act's sequential five-step analysis and found that Mr. Pendleton was not disabled under section 1614(a)(3)(A) of the Social

Security Act (R. 19-23). The ALJ found that Step 1 was met because Mr. Pendleton had not engaged in any substantial gainful activity since the January 17, 2006 date of his application (R. 19). At Step 2, the ALJ found that Mr. Pendleton suffered from the following severe impairments: plantar fasciitis, post traumatic degenerative joint disease, and flat feet bilaterally (R. 19-20). The ALJ then concluded at Step 3 that Mr. Pendleton does not have any impairment or combination of impairments that meets or medically equals one of the listed impairments (R. 20). Next, the ALJ determined that Mr. Pendleton has the following RFC:

> perform medium work as defined in 20 CFR 416.967(c) except that he would only be able to stand up for 2 hours and walk about 6 hours. He should never climb ladders, ropes, or scaffolds, and only occasionally balance, crouch, or crawl and should avoid concentrated exposure to machinery and heights.

(R. 20).

In determining Mr. Pendleton's RFC, the ALJ noted Mr. Pendleton's testimony about the functional limitations caused by the constant and unrelieved pain in his left foot, as well as the pain in his right foot from compensating for the left foot. The ALJ further noted that findings revealed "multiple fractures in [Mr. Pendleton's] left foot and an old healed fracture" (R. 21). The ALJ observed that the October 13, 2006 medical report diagnosing Mr. Pendleton's plantar fasciitis listed his injury as "mild "(*Id.*, citing R. 274). The ALJ also noted that Mr. Pendleton "stated that he underwent treatment at Stroger hospital for approximately nine months" and had undergone three weeks of physical therapy to help decrease his foot pain (*Id.*, citing R. 369-370). The ALJ also noted that Mr. Pendleton's painful blisters had been treated, "resolved, and considered completely healed" (R. 21, citing R. 243). Based on this information, the ALJ found that Mr. Pendleton's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but Mr. Pendleton's statements "concerning the intensity, persistence and limiting effects" from the

symptoms of his medically determinable impairments "were not credible to the extent they [were] inconsistent with the [ALJ's] RFC assessment" (R. 20-21).

The ALJ provided the following reasons for his adverse credibility finding. *First*, the ALJ stated that Mr. Pendleton's complaints of pain in the right foot were contradicted by medical evidence that shows he had only minimal deformity in the mid shaft of the fourth proximal phalanx (*Id.*, citing R. 304, 306). *Second*, the ALJ noted that Mr. Pendleton was "not currently taking any narcotic based pain relieving medications in spite of the allegations of quite limiting pain" (*Id.*). *Third*, the ALJ observed that, contrary to Mr. Pendleton's description of his symptoms, Mr. Pendleton did not exhibit any problems with "walking, standing, sitting, concentration or with understanding" during his March 16, 2006 Social Security interview, as he was reported to have a "normal and well kept appearance" (*Id.*). Consequently, the ALJ found that " although [Mr. Pendleton] has significant discomfort of his left and right foot, impairment is not severe enough to preclude [Mr. Pendleton] from working" (R. 21).

Based on the stated RFC, the VE's testimony, and Mr. Pendleton's description of his past relevant work, the ALJ determined at Step 4 that Mr. Pendleton lacks the physical RFC to perform his past relevant work (R. 21). The ALJ then observed that Mr. Pendleton was 39 years old on the date when his SSI application was filed, making him a younger individual age 18-49 under 20 C.F.R. 416.963 (*Id.*). The ALJ found that Mr. Pendleton has at least a high school education and is able to communicate in English, and that transferability of job skills is not material to the determination of disability because Mr. Pendleton is "not disabled" under the Medical-Vocational Rules, whether or not he has transferable job skills (R. 21, citing SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

At Step 5, the ALJ found that there are significant jobs in the national economy for an individual of Mr. Pendleton's age, education, work experience, and RFC. In so finding, the ALJ relied on the VE's testimony that, given all of these factors, "an individual would be able to perform the requirements of representative occupations at the sedentary level such as bench assembly (2,900 [jobs]); [m]achine tender (3,500 [jobs]); and hand packer (3,600 [jobs])" (R. 22). The ALJ then concluded that Mr. Pendleton was capable of making a successful adjustment to other work and therefore was not disabled.

### III.

We begin our review of the Commissioner's determination by setting forth the governing legal standards. To establish a disability under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Substantial gainful activity includes work that a claimant did before the impairment and any other kind of gainful work generally available in significant numbers within the national economy. 42 U.S.C. § 423(d)(2)(A).

The social security regulations provide a five-step evaluation process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). These steps are evaluated sequentially, and require the ALJ to determine: (1) whether the claimant is currently performing any "substantial gainful activity;" (2) whether the claimant's alleged impairment or combination of impairments is severe; (3) whether any of the claimant's impairments meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his or her past relevant work; and (5) whether the claimant is unable to perform

13

any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4); *see also Young v. Sec'y of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992). A finding of disability requires an affirmative answer at either Step 3 or Step 5. *Id.* A negative finding at any step other than Step 3 precludes a finding of disability. *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). The claimant has the burden of proof in Steps 1 through 4. 20 C.F.R. § 404.1520(g)(1). By meeting this burden, the claimant makes a *prima facie* case of disability, and the burden shifts to the Commissioner in Step 5 to prove that a significant number of jobs are available in the national economy for an employee with the claimant's ability. 20 C.F.R. §§404.1520(g); *Roderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).

On appeal, the court may not decide facts anew, reweigh evidence, or substitute its own judgment for that of the ALJ. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). We uphold the ALJ's decision if it is supported by substantial evidence; that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal citations and quotations omitted). "[W]here conflicting evidence allows reasonable minds to differ," the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or the ALJ), not the courts. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ "has authority to assess the medical evidence and give more weight to evidence he finds more credible"). The Court is limited to establishing whether the Commissioner's final decision is "supported by substantial evidence and [is] based on the proper legal criteria." *Ehrhart v. Sec'y of Health and Human Services*, 969 F.2d 534, 538 (7th Cir. 1992). A finding may be supported by substantial

evidence even if a reviewing court might have reached a different conclusion. *See Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir. 1986) (per curiam).

However, while judicial review of ALJ decisions is "deferential," it is "not abject." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). We uphold an ALJ's decision if it is supported by substantial evidence; that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Terry*, 580 F.3d at 475 (internal citations and quotations omitted). The ALJ must consider all relevant evidence, and may not select and discuss only the evidence which favors his or her ultimate conclusion. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). While the ALJ is not required to address every piece of evidence or testimony presented, the Court "cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker*, 597 F.3d at 921 (internal citations omitted); *Craft*, 539 F.3d at 676..

## IV.

Mr. Pendleton raises two challenges to the ALJ's determination that he is not disabled: (1) the ALJ erred in proceeding to decision without obtaining additional medical evidence that the ME testified was missing and relevant to Mr. Pendleton's symptoms, and (2) the ALJ's RFC determination is not supported by substantial evidence. We address each of Mr. Pendleton's arguments in turn.

### A.

Mr. Pendleton argues that even though the ME "suspected the presence of other possible [medical] conditions and expressly identified certain testing" to establish whether those conditions were present, the ALJ erroneously failed to "send Mr. Pendleton out for additional testing" before